IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DORIAN O. CHAMBERS,              )
                                 )
            Petitioner           )
                                 )
     v.                          )        1:20CV498
                                 )
LEOPOLD S.P. RUSSELL,            )
                                 )
            Respondent.          )


<u>**MEMORANDUM OPINION AND ORDER**</u>

**OSTEEN, JR., District Judge**

Presently before the court is Petitioner Dorian O.
Chambers' Verified Petition under the Hague Convention on the
Civil Aspect of International Child Abduction (the "Hague
Convention") seeking the return of her minor child, Z.R. (Doc.
1.) Respondent, Leopold S.P. Russell, is Z.R.'s biological
father. Respondent brought Z.R. to the United States ("U.S.")
from Jamaica and refuses to return him. Following a bench trial,
the court finds it should grant Petitioner's request to order
the return of Z.R. to Jamaica.

I.   <u>**BACKGROUND**</u>

Following the trial held on August 5, 2020, this court made
findings of fact orally in open court. (Minute Entry
08/05/2020.) Those facts are incorporated by reference herein.

The court finds additional facts from the verified pleadings, as well as the evidence presented at the hearing. (Id.) Additional factual findings relevant to Respondent's affirmative defenses are addressed in later portions of this Memorandum Opinion and Order.

Petitioner is a citizen of Jamaica and the biological mother of her son, Z.R. (Verified Petition ("Verified Pet.") (Doc. 1) ¶ 1; Doc. 1-3.) Respondent is Z.R.'s biological father and a permanent resident of the United States. (Doc. 1-3; Minute Entry 08/05/2020.) Respondent and Petitioner have never been married to one another. (Minute Entry 08/05/2020.) Z.R. is thirteen years old; he was born in 2007 in Jamaica and lived there his whole life until Respondent removed Z.R. to the United States in August 2019. (Verified Pet. (Doc. 1) ¶¶ 7-8, 11-12.)

After Z.R. was born, he stayed with Petitioner initially, but then moved to a different town in Jamaica to stay with Respondent. (Minute Entry 08/05/2020.) At the time, Petitioner was completing her education as a registered nurse. (Id.) After Petitioner finished her degree, she took physical custody of Z.R., who was around two years old at the time. (Id.)

Petitioner and Respondent do not have a formal custody order from any court. (Id.) Instead, until Z.R.'s removal in August 2019, Petitioner and Respondent acted pursuant to their

-2-

custodial agreement whereby Petitioner had primary physical custody of Z.R. and would supervise his day-to-day care. (Id.) Petitioner would sometimes consult with Respondent about the decisions she made regarding Z.R.'s upbringing, but often she made a decision and then informed Respondent of her decision after the fact. (Id.; Doc. 1-8 at 2.)[1] It was agreed that Z.R. would stay with Respondent during certain holidays and for several weeks each summer. (Minute Entry 08/05/2020.) Respondent provided monthly payments of between 15,000 to 20,000 Jamaican Dollars to Petitioner for Z.R.'s benefit.[2] (Id.) Respondent would also provide other funds when Z.R. had special needs that arose. (Id.) Respondent made those payments by depositing the funds directly into Petitioner's bank account. (Id.)

In 2018, Respondent left Jamaica and moved to the United States. (Id.) At some point during that same time, Petitioner began to seek new employment in the United Kingdom ("U.K."). (Id.) Petitioner found a job as healthcare worker in the U.K. and was able to secure a visa for herself. (Id.)

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

[2] Respondent testified that was between $100 to $200 United States Dollars. (Minute Entry 08/05/2020.)

-3-

Petitioner planned to bring Z.R. with her to the U.K. (Id.) Petitioner first applied for Z.R.'s visa in February 2019. (Id.) In order to obtain a visa for Z.R., Petitioner was advised that Respondent, as Z.R.'s father, would have to provide written consent to Petitioner's movement of Z.R. to the U.K. (Id.) Respondent signed such a letter in February 2019. (Id.; Doc. 1-7; Verified Answer (Doc. 15) ¶ 9.) Z.R.'s first visa application was rejected. (Minute Entry 08/05/2020.) Petitioner appealed and was informed by the U.K.'s embassy in Jamaica that Petitioner would have to either provide proof of a formal custody order or some other evidence that she had sole responsibility for Z.R.'s upbringing. (Id.) Petitioner had a solicitor in Jamaica draft a new letter for Respondent to sign to attest to Petitioner's role in raising Z.R. (Id.) Respondent never signed that letter. (Id.)

Petitioner moved to the U.K. and started her job on or about March 21, 2019. (Id.) Petitioner made the decision to leave Z.R. with family in Jamaica so he could finish his final year of primary school. (Id.) Specifically, Petitioner decided to leave Z.R. in the care of her niece, who was eighteen at the time, and her nephew, who was twenty. (Id.) Petitioner's sister did not live with Z.R. and her children but did check on them periodically. (Id.) Based on text messages admitted at trial,

−4−

the court finds that Respondent consented to Z.R. remaining in Jamaica and suggested Petitioner's niece as a temporary custodian. (Id.)

Petitioner also had Z.R. take the entrance exam for a school in Clarendon, Jamaica. (Id.; Doc. 1-8 at 3.) That school was the next level beyond primary school and was close enough to the residence of Petitioner's sister that, after Z.R. returned from his summer visit to Respondent, he could start there and live with his aunt in Clarendon. (Minute Entry 08/05/2020.) However, Petitioner still hoped to be able to bring Z.R. to the U.K. with her after his summer visit to Respondent. (Id.) Petitioner planned to reapply for Z.R.'s visa when she returned to Jamaica in July 2019 for Z.R.'s primary school graduation. (Id.; Doc. 1-8 at 4.)

Petitioner left for the U.K. in March 2019, leaving Z.R. in the care of her niece and nephew. (Id.) Petitioner would speak with Z.R. once or twice every day. (Id.) Petitioner continued to pay rent and utilities in the house where Z.R. continued to live with his cousins. (Id.) Petitioner returned to Jamaica in July 2019 for Z.R.'s primary school graduation. (Id.) Respondent also came to Jamaica for Z.R.'s graduation. (Id.)

As he did during the summer,[3] Z.R. was going to spend several weeks with Respondent after his graduation in summer 2019. (Id.) Before Z.R. left for the U.S. on his visit, Petitioner planned to take Z.R. back to the U.K. embassy to reapply for his visa. (Id.) However, there was a confrontation between Petitioner and Respondent after Z.R.'s graduation ceremony, and Respondent took Z.R.'s passport, a necessary document for Z.R.'s visa appointment at the embassy. (Id.) As a result, Petitioner could not take Z.R. to the U.K. embassy for his visa appointment in June 2019. (Id.) In late June 2019, Respondent took Z.R. with him back to the U.S. for Z.R.'s annual summer visit. (Id.) Petitioner returned to the U.K. for her job. (Id.)

On August 15, 2019, Petitioner texted Respondent to ask when Z.R. would return to Jamaica — Petitioner was planning on setting up another visa appointment for Z.R. once he returned. (Doc. 1-8 at 1, 4.) In response, Respondent texted "He will return on August 28, 2019[.] As per usual[.]" (Doc. 1-8 at 1.) Respondent actually brought Z.R. back earlier, because he had

---

[3] Both Petitioner and Respondent testified, and this court finds that the custody arrangement between Petitioner and Respondent consisted of physical custody with Petitioner for the majority of the year. Respondent had physical custody during "holidays," which included summer vacations.

decided to register Z.R. at a new school close to Respondent's family in St. Ann, Jamaica. (Id. at 2; Doc. 1-9 at 4; Verified Answer (Doc. 15) ¶ 11.) Though Petitioner had made plans for Z.R. to matriculate at another school in Clarendon so he could live with Petitioner's sister, Respondent unilaterally implemented another plan. (Doc. 1-9 at 4.) Respondent was unable to complete Z.R.'s registration at school, however, because he did not have Z.R.'s immunization records. (Doc. 1-8 at 5.)[4]

Respondent removed Z.R. from Jamaica on or about August 21, 2019. (Verified Pet. (Doc. 1) ¶ 11; Doc. 1-8 at 15.) Respondent brought Z.R. back to Respondent's home in Concord, North Carolina. (Verified Pet. (Doc. 1) ¶ 13.) Petitioner has asked Respondent to return Z.R. to Jamaica in accordance with their previous agreement and so Petitioner can arrange for Z.R. to complete the U.K. visa process. (Minute Entry 08/05/2020.) Respondent refused, telling Petitioner she would have to get a "court order" to get him to return Z.R. to Jamaica. (Doc. 1-8 at 15.)

---

[4] Once Respondent took Z.R. back to the U.S., he registered him in school in North Carolina. Respondent stated he was able to do so because he got Z.R. re-immunized. When asked why he didn't have Z.R. re-immunized in Jamaica, Respondent stated he did not have time. (Minute Entry 08/05/2020.)

Petitioner filed her Verified Petition for Return of the Child Under the Convention on the Civil Aspects of International Child Abduction (The "Hague Convention") on June 5, 2020. (Verified Pet. (Doc. 1).) Petitioner sought a Temporary Restraining Order ("TRO") to prevent Respondent from removing Z.R. from the Middle District of North Carolina until her Verified Petition was resolved. (Doc. 2.) The court granted Petitioner's motion for a TRO. (Doc. 8.) After a hearing, where Respondent was present, the parties consented to a preliminary injunction pending resolution of Petitioner's case. (Doc. 18; Minute Entry 07/01/2020.)

After a limited period of discovery, the court held a hearing during which it conducted an in camera examination of Z.R. (Minute Entry 07/23/2020.)[5] Counsel for both parties were present for that examination, but the parties themselves were not.

The court later conducted a bench trial on the Verified Petition. (Minute Entry 08/05/2020.) In light of the COVID-19 pandemic and travel difficulties for Petitioner, the parties consented to conducting the bench trial over video conferencing software. Petitioner testified, Respondent testified, and

---

[5] Respondent filed a Motion to Dismiss the action a week prior to the bench trial. (Doc. 23.) That motion will be denied as moot.

Respondent's wife testified. At the conclusion of the bench trial, the court announced its initial finding that the Verified Petition should be granted. (Id.) The court also reemphasized that the preliminary injunction would remain in effect until this Memorandum Opinion and Order was entered. (Id.)

## II. <u>ANALYSIS</u>

The Hague Convention, as implemented through the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 2001 <u>et</u> <u>seq.</u>, was created with the purpose "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." International Child Abduction Convention, 1988 WL 411501 ("Hague Convention"). "[T]he primary purpose of the Hague Convention is 'to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.'" <u>Miller v. Miller</u>, 240 F.3d 392, 398 (4th Cir. 2001) (quoting <u>Friedrich v. Friedrich</u>, 983 F.2d 1396, 1400 (6th Cir. 1993)). A court considering a Hague Convention petition ("Hague petition") has jurisdiction only over the wrongful removal or retention claim. <u>See</u> Hague Convention, art. 16.

–9–

In order to secure the return of an abducted child, a petitioner must prove by a preponderance of the evidence that the child "has been wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9003(e)(1). A petitioner must prove the following to establish a prima facie case of wrongful removal: "(1) the child was 'habitually resident' in the petitioner's country of residence at the time of removal, (2) the removal was in breach of the petitioner's custody rights under the law of his home state, and (3) the petitioner had been exercising those rights at the time of removal." Bader v. Kramer, 484 F.3d 666, 668 (4th Cir. 2007) ("Bader II"). Once a petitioner has made out a prima face case of wrongful removal, "return of the child is required unless the respondent establishes one of four defenses." Id.

### A.   Habitual Residence

The first prong of the wrongful removal prima facie case requires the court to determine the location of the child's habitual residence. Bader II, 484 F.3d at 668. The burden is on the petitioner to prove by a preponderance of the evidence that "the child was 'habitually resident' in the petitioner's country of residence at the time of removal." Id.

As the Fourth Circuit stated in Miller v. Miller, 240 F.3d 392, 400 (4th Cir. 2001), "[t]he Hague Convention does not

-10-

define 'habitual residence.'" The court, looking to its sister circuits, concluded that "there is no real distinction between ordinary residence and habitual residence." Id. "A person can have only one habitual residence. On its face, habitual residence pertains to customary residence prior to the removal. The court must look back in time, not forward." Id. (quoting Friedrich, 983 F.2d at 1401). "This is a fact-specific inquiry that should be made on a case-by-case basis." Id. Importantly, "a parent cannot create a new habitual residence by wrongfully removing and sequestering a child." Id.

"Federal courts have developed a two-part framework to assist in the habitual residence analysis." Maxwell v. Maxwell, 588 F.3d 245, 251 (4th Cir. 2009). First, the court must determine "whether the parents shared a settled intention to abandon the former country of residence." Id. (citing Mozes v. Mozes, 239 F.3d 1067, 1075 (9th Cir. 2001)). Second, the court determines "whether there was 'an actual change in geography' coupled with the 'passage of an appreciable period of time, one sufficient for acclimatization by the [child] to the new environment.'" Id. (quoting Papakosmas v. Papakosmas, 483 F.3d 617, 622 (9th Cir. 2007)).

That two-part framework is less rigid following the Supreme Court's decision in Monasky v. Taglieri, ____ U.S. ____, 140 S.

-11-

Ct. 719 (2020). In that decision, the Court held "that a child's habitual residence depends on the totality of the circumstances specific to the case. An actual agreement between the parents is not necessary to establish an infant's habitual residence." Id. at 723. Monasky involved a question of habitual residence for a young child born in Italy. The child's parents had come to Italy from the United States and no definite plans to return. The father was abusive towards the mother, and eventually the mother left Italy and returned to the U.S. with the child. The father, still in Italy, petitioned for the child's return. The district court ordered the return of the child, finding that the parents never shared an intent for the child to move to the United States. The Supreme Court reversed, finding that the district court had relied too much on the shared intent of the parties when the inquiry is fact intensive. The Court stated that "[n]o single fact . . . is dispositive across all cases." Id. at 727. However, the Court also noted that "[c]ommon sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence." Id.

The court finds that, even in light of Monasky, an analysis of Petitioner and Respondent's intent is still appropriate, though not dispositive. First, Monasky did not hold that intent

-12-

does not matter, only that it is not an imperative.[6] Second, the facts in Monasky distinguish it from this case. In Monasky, the Court was dealing with parents who had yet to develop any informal custody agreement for their infant child.[7] As explained more fully below, Petitioner and Respondent's actions in August 2019 evinced a shared intent for Z.R. to remain in Jamaica, as he had done for his thirteen years prior, unless the parties agreed otherwise. Those actions in August 2019 were part of a decade of shared custody consistent with a shared intent that Z.R. remain in Jamaica. Finally, since Monasky did not overturn the two-prong approach outright,[8] this court will still apply it, cognizant of the Supreme Court's directive that the inquiry is fact intensive and that the Hague Convention exists "to ensure that custody is adjudicated in what is presumptively the most appropriate forum — the country where the child is at home." Id. at 727.

---

[6] The Court cited a United Kingdom opinion approvingly that stated "[a] child's habitual residence depends on numerous factors with the purposes and intentions of the parents being merely one of the relevant factors." Monasky, 140 S. Ct. at 728 (internal quotations and alterations omitted).

[7] "The bottom line: There are no categorical requirements for establishing a child's habitual residence — least of all an actual-agreement requirement for infants." Monasky, 140 S. Ct. at 728.

[8] No court in the Fourth Circuit has yet to address Monasky.

Case 1:20-cv-00498-WO-JLW   Document 25   Filed 08/26/20   Page 13 of 43

The court will first address the parties' intent and then turn to the geographical location analysis.

### 1.  **Shared Parental Intent**

"[T]he first question is whether the parents shared a settled intention to abandon the former country of residence." Maxwell, 588 F.3d at 251. Again, a "person can have only one habitual residence. On its face, habitual residence pertains to customary residence prior to the removal. The court must look back in time, not forward." Miller, 240 F.3d at 400 (quoting Friedrich, 983 F.2d at 1401).

Though Respondent conceded this prong at the initial hearing, he now contests it. Respondent argues that parental intent was a "moving target," meaning the new country of habitual residence was no longer Jamaica. The court disagrees.

The evidence reveals that there was never a shared parental intent to abandon Jamaica — quite the opposite. The evidence reveals a shared intent for, and expectation of Z.R. remaining in Jamaica. Respondent is correct that Petitioner and Respondent discussed future plans for Z.R., which included leaving Jamaica

-14-

to move to the U.K. with Petitioner.[9] However, the inquiry is backwards looking, not forward.

First, the court finds that Petitioner's country of residence at the time of Z.R.'s removal was Jamaica. Petitioner was working in the U.K. pursuant to a work visa — her immigration status in that country was not permanent. (Minute Entry 08/05/2020.) She was and remains a Jamaican citizen. (Id.) Petitioner maintained close contact with Z.R. and other family members in Jamaica. (Id.) Petitioner directed Z.R.'s care from the U.K., to include arranging housing, funding, schooling, and supervision. (Id.) Petitioner returned to Jamaica once between March and August 2019 and has made plans to return there upon Z.R.'s own return. (Id.) Petitioner has continued to try and secure Z.R.'s U.K. visa so he can join her in the U.K.; Petitioner's plan was not to leave Jamaica without Z.R. (Id.) No evidence was presented at trial that Petitioner plans to

---

[9] Although Respondent testified that the parties had agreed in the past that Z.R. would reside with him after primary school, this court rejects that testimony, certainly to the extent it suggests Petitioner agreed to Z.R. remaining in the United States beyond his summer visit. However, Respondent had previously consented to Z.R. traveling to the U.K. with Petitioner. Even though Z.R. was initially not able to do so, both Petitioner and Respondent had registered Z.R. for school in Jamaica; this court finds the parties agreed that Z.R. would remain in Jamaica until the visa issue was resolved.

permanently remain in the U.K. The court finds that Petitioner's residence was still Jamaica at the time of Z.R.'s removal.

Second, the evidence conclusively establishes that Z.R. was habitually resident in Jamaica, Petitioner's residence. Z.R. lived in Jamaica from his birth until his removal. (Verified Pet. (Doc. 1) ¶ 7.) Under Petitioner and Respondent's informal custody agreement, Z.R. would visit Respondent, but would always return to Petitioner. (Minute Entry 08/05/2020.) In the summer of 2019, when Z.R. visited Respondent in the U.S., there is no question that both parents intended for Z.R. to return to, and stay in Jamaica until his U.K. visa was finalized. Indeed, Respondent told Petitioner that Z.R. would return to Jamaica on August 28, 2019 "[a]s per usual." (Doc. 1-8 at 1.) Further, the court notes Respondent disagreed with Petitioner about where Z.R. should live in Jamaica, and Respondent made efforts to register Z.R. for secondary school in St. Ann, Jamaica, near his own family. (Id. at 2.) As Respondent texted Petitioner, "[Z.R.] will be staying with my family until you finish process whatever it is you are doing[.]" (Id.) There is no question that Petitioner and Respondent both intended for Z.R. to remain in Jamaica in August 2019. This court finds that Petitioner and Respondent agreed Z.R. would remain in Jamaica until the visa issue was resolved. However, the parties had not reached

-16-

agreement as to where Z.R. would attend school or with whom he would reside while awaiting the visa.

As evidence of shared intent to abandon Jamaica, Respondent testified about a supposed informal custody agreement that differed from the one described by Petitioner in her testimony. According to Respondent, the plan was that Z.R. would live with Respondent full-time after Z.R. finished primary school. However, Respondent's own behavior during August 2019 belies that assertion. Respondent said Z.R. would return to Jamaica on August 28, 2019, "[a]s per usual," (Doc. 1-8 at 1). When Respondent returned Z.R. to Jamaica in August 2019, he attempted to register him at a school in St. Ann, Jamaica, before Respondent returned to the U.S, (id. at 2). Even if there was another custody arrangement in the past, Respondent's behavior in August 2019 establishes that that agreement was no longer in force.

Respondent's focus on future intentions is misplaced. For one, those intentions were not shared. For another, Petitioner and Respondent's shared intentions at the time of removal were, as Respondent himself admitted, that Z.R. would return to Jamaica. That intent manifested itself not only in August 2019, but in the decade of shared custody prior to that.

## 2. **Actual Change in Geography**

In determining a child's habitual residence, a court must also determine "whether there was 'an actual change in geography' coupled with the 'passage of an appreciable period of time, one sufficient for acclimatization by the [child] to the new environment.'" Maxwell, 588 F.3d at 251 (quoting Papakosmas, 483 F.3d at 622).

> The question here "is not simply whether the child's life in the new country shows some minimal degree of settled purpose," but whether the "child's relative attachments to the countries have changed to the point where [ordering the child's return] would now be tantamount to taking the child out of the family and social environment in which its life has developed."

Id. at 253-54 (quoting Mozes, 239 F.3d at 1081). "Federal courts have considered school enrollment, participation in social activities, the length of stay in the relative countries, and the child's age to determine the extent of a child's acclimatization to the new country of residence." Id. at 254. Again, a parent cannot create a new habitual residence by wrongfully removing a child from the child's original habitual residence. Miller, 240 F.3d at 400.

Though Z.R. had visited the U.S. in summer 2019, he had come back to Jamaica in August 2019 after less than two months. Z.R. lived in Jamaica from his birth in 2007 until he was removed by Respondent in August 2019. Z.R. was registered to

-18-

begin a secondary school in Clarendon, Jamaica, where Petitioner's family would care for him.

Though Z.R. has developed some attachment to the U.S. after his removal by Respondent, those attachments are not so great that they overcome his life-long attachments to Jamaica. Z.R. has made some friends in the U.S. and completed a year of school in the U.S. from 2019-2020. However, both Respondent and his wife testified that Z.R. has only a few new friends in the U.S. (Doc. 21-1 at 59; Minute Entry 08/05/2020.)[10] Z.R.'s limited time in the U.S. has not created ties so strong that his return to Jamaica would be "tantamount to taking the child out of the family and social environment in which its life has developed." Maxwell, 588 F.3d at 253–54; cf. Rodriguez Palomo v. Howard, 426 F. Supp. 3d 160, 174 (M.D.N.C. 2019), aff'd, 812 F. App'x 155 (4th Cir. 2020) (child had been in Spain long enough to acclimate). Far from it, Z.R.'s return to Jamaica will return him to the family and life he has known for almost all of his thirteen years.[11]

---

[10] During his deposition, Respondent could not name any of Z.R.'s new friends. (Doc. 21-1 at 59.) This suggests that his connection with these friends is not nearly as great as Respondent would have the court believe.

[11] Finally, the court also notes that Z.R. has over-stayed his U.S. visitor's visa, further proof that Jamaica is his habitual residence. (Minute Entry 08/05/2020.)

-19-

Regardless of whether Z.R. has created sufficient ties in the U.S. during his short time here, a parent cannot create a new habitual residence by wrongfully removing a child from another. <u>Miller</u>, 240 F.3d at 400. The "'primary purpose' of the Convention [is] 'to preserve the [pre-removal] status quo.'" <u>White v. White</u>, 718 F.3d 300, 307 (4th Cir. 2013) (quoting <u>Miller</u>, 240 F.3d at 398). Even if Z.R. had developed greater ties in the U.S. since his removal, Respondent cannot subvert the Hague Convention's primary purpose by wrongfully removing Z.R. and creating a new habitual residence.

"Where a child has lived in one place with [his] family indefinitely, that place is likely to be [his] habitual residence." <u>Monasky</u>, 140 S. Ct. at 727. Such is the case here. Therefore, the court finds that Z.R.'s habitual residence is Jamaica.

**B.   <u>Breach of Custody Rights in Home State</u>**

The law of the child's habitual residence governs custody rights. <u>See</u> Hague Convention, art. 3. In this case, Jamaican law governs, because Jamaica is Z.R.'s habitual residence is Jamaica. "[C]ourts have repeatedly assumed rights of custody for purposes of Article 3 of the Convention means rights of custody at the time of removal." <u>White</u>, 718 F.3d at 307.

According to Jamaican law, "any person who is the parent or legal guardian of a child, or who is legally liable to maintain the child, shall be presumed to have the custody of the child, and as between father and mother, neither shall be deemed to have ceased to have such custody by reason only that the father or mother has deserted, or otherwise does not reside with, the other parent and the child . . . ." Jamaican Child Care and Protection Act § 2(4)(a).[12]

Respondent contends, and Petitioner seems to concede, that Respondent and Petitioner have equal custody rights under Jamaican law. (Minute Entry 08/05/2020; Doc. 21 at 8.) Respondent argues that this means there could be no breach of Petitioner's custody rights since Respondent was simply exercising his.

The first Fourth Circuit opinion in Bader v. Kramer is instructive for situations where a petitioner shares custody rights with a respondent in the absence of a formal custody order. In Bader, the Fourth Circuit reversed a district court's conclusion that Bader, the petitioning father, did not have custody rights that were violated when Kramer, the respondent mother, took their child to the United States from Germany, and

_____

[12] Petitioner provided a digital copy of the Jamaican Child Care and Protection Act. (Doc. 1-12.)

refused to return him. <u>Bader v. Kramer</u>, 445 F.3d 346, 351 (4th Cir. 2006) ("<u>Bader I</u>"). Bader and Kramer had begun divorce proceedings in Germany prior to the child's removal. The German court had not yet made a custody determination, but that court had set child support and visitation guidelines for Bader. Since no custody order was in force at the time of removal, the German Central Authority noted that both parents still had "parental responsibility for the child pursuant to Section 1626 of the German Civil Code (BGB)." <u>Id.</u> at 348. The Fourth Circuit agreed, holding

> it is clear that Bader retained at least joint custody over C.J.B. because no competent German court has entered an order granting Kramer sole custody. Thus, we remand the case to the district court for an expeditious determination of whether Bader was exercising those custody rights and whether any defenses apply under the Hague Convention.

<u>Id.</u> at 351.

As in <u>Bader I</u>, the evidence in this case conclusively establishes that Petitioner had "retained at least joint custody" over Z.R. Under Jamaican law, a parent "shall be presumed to have the custody of the child, and as between father and mother, neither shall be deemed to have ceased to have such custody by reason only that the father or mother . . . does not reside with, the other parent and the child . . . ." Jamaican Child Care and Protection Act § 2(4)(a). Respondent's reliance

-22-

on his own custody rights ignores the fact that Petitioner also
has custody rights. Respondent violated those custody rights
when he removed Z.R. from his habitual residence, in
contravention of the parties' original custodial agreement, and
repeatedly refused to return him. The only remaining question
then is whether Petitioner was actually exercising her custody
rights at the time of removal.

**C.   Whether Petition Was Actually Exercising Custody
       Rights**

"[A] showing of actual exercise is a necessary element of a
claim of wrongful removal under the Hague Convention. Despite
this requirement, the Hague Convention does not define
exercise." Bader II, 484 F.3d at 670. Courts "liberally find
'exercise' whenever a parent with de jure custody rights keeps,
or seeks to keep, any sort of regular contact with his or her
child." Id. at 671 (quoting Friedrich, 78 F.3d at 1065); Walker
v. Walker, 701 F.3d 1110, 1121 (7th Cir. 2012) (noting that the
"actually exercising" standard is a "liberal" one).

> [A] person [who] has valid custody rights to
> a child under the law of the country of the
> child's habitual residence . . . cannot fail
> to "exercise" those custody rights under the
> Hague Convention short of acts that
> constitute clear and unequivocal abandonment
> of the child.

Friedrich, 78 F.3d at 1066. Further, "[o]nce it
determines the parent exercised custody rights in any
manner, the court should stop — completely avoiding

-23-

the question whether the parent exercised the custody
rights well or badly."

Bader II, 484 F.3d at 671 (quoting Friedrich, 78 F.3d at 1066)

(emphasis added). "Although there may be situations when a long

period of unexplainable neglect of the child could constitute

non-exercise of otherwise valid custody rights under the

Convention, as a general rule, any attempt to maintain a

somewhat regular relationship with the child should constitute

'exercise.'" Friedrich, 78 F.3d at 1065-66.[13]

Bader II dealt with a parent who was only intermittently

physically present but continued to pay child support and

perform other custodial acts. The Fourth Circuit explained that

it had

> no difficulty affirming the district court's finding
> that Bader exercised his right to joint custody here.
> During the three months between his release from
> prison and C.J.B.'s removal, Bader had actual physical
> custody of C.J.B. on at least three occasions . . . .
> In addition, Bader paid child support to Kramer when

---

[13] This test is subject to the following caveat:

> [T]his approach will not apply when the country of
> habitual residence, by law, expressly defines the
> exercise of custody rights for purposes of the Hague
> Convention. Similarly, when a competent judicial
> tribunal in the country of habitual residence has made
> a determination as to whether a parent was exercising
> his custody rights, that determination will normally
> be conclusive.

Bader II, 484 F.3d at 671 n.1. None of those circumstances apply
in this case.

-24-

ordered to do so and financially supported C.J.B.
during the times when she was in his custody. While
any one of these facts might suffice to establish that
Bader did not clearly and unequivocally abandon
C.J.B., their aggregation certainly does so, leading
to the conclusion that Bader actually exercised his
custody rights under the Hague Convention.

Bader II, 484 F.3d at 671.

The facts supporting Petitioner's actual exercise of her custody rights are even stronger than those in Bader II. Petitioner had made extensive plans for Z.R.'s care in her absence and continued to monitor and direct his care while in the U.K. Petitioner arranged for her niece and nephew to care for Z.R. in spring of 2019 so he could finish primary school. (Minute Entry 08/05/2020.) Petitioner continued to pay rent and utilities for the home in which Z.R. and his cousins lived. (Id.) Petitioner arranged for her sister, the mother of her niece and nephew, to also check in periodically. (Id.) Petitioner would call and speak to Z.R. every day, usually twice a day, schedule permitting. (Id.) Even while Petitioner was overseas, Respondent testified that he continued to make his informal child support payments directly to Petitioner so she could use it for Z.R.'s needs. (Id.) To prepare for the possibility that Z.R.'s visa application would not be approved before he was supposed to start school in August 2019, Petitioner also had Z.R. take the entrance exam for a secondary

-25-

school in Clarendon, Jamaica, and made plans for him to stay with Petitioner's sister in Clarendon after Z.R. returned from his summer visit. (Doc. 1-8 at 4.) Petitioner was consistently and repeatedly exercising her custody rights prior to August 2019.

Respondent's actions conformed with Petitioner's plan until August 2019. Pursuant to that plan that Petitioner put in place, Respondent returned Z.R. to Jamaica as agreed. (Id. at 1.) Though Respondent tried to alter Petitioner's plan and register Z.R. in a different school in Jamaica, Respondent's frustration with Petitioner's plans admits that she did have a plan and had made arrangements for Z.R. upon his return to Jamaica in August 2019. It was Petitioner who was directing Z.R.'s care, a stronger indication she was actually exercising her custody rights than the father in Bader II.[14]

Far from evincing Petitioner's "clear and unequivocal abandonment of the child," her actions in caring for Z.R. show a

---

[14] There is one difference between this case and Bader II, but it does not change this court's analysis. Unlike the more frequent visits in Bader II, Petitioner visited Z.R. only once during the period from March 2019 until Z.R.'s graduation. Petitioner obviously did not visit Z.R. between June and August while Z.R. was in the U.S. with Respondent as agreed and customary. The court does not find this distinction significant. Petitioner was in effect exercising sole care and custody of Z.R. between March and June; additionally, their separation was intended to be temporary.

-26-

continued involvement in his upbringing as she directed his care from afar. Respondent's attempts to classify Petitioner's childcare decisions as improper do not diminish the fact that Petitioner was exercising her custody rights at the time of removal.

Once a court determines a parent was exercising her custody rights, "the court should stop — completely avoiding the question whether the parent exercised the custody rights well or badly." Bader II, 484 F.3d at 671 (quoting Friedrich, 78 F.3d at 1066). The court finds that Petitioner was exercising her custody rights at the time of removal.

### D. **Defenses**

The court finds that Petitioner has proven her prima facie case by a preponderance of the evidence. Z.R. should therefore be returned to Jamaica absent Respondent's ability to establish one of the affirmative defenses.

> Two of the defenses must be supported by clear and convincing evidence: (1) that return would expose the child to a "grave risk" of "physical or psychological harm or otherwise place [the child] in an intolerable situation" and (2) that return of the child would not be permitted by "fundamental principles of the United States relating to the protection of human rights and fundamental freedoms." The other two defenses may be supported by a preponderance of the evidence: (1) that the petition for return was not filed within one year of the removal and the child is now well-settled in another country . . . .

Bader II, 484 F.3d at 668-69.

The court "may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, art. 13. A respondent has the burden of proving this by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B).

Respondent raises three defenses: (1) the Well-Settled Defense, (2) the Wishes-of-the-Minor-Child Defense, and (3) the Grave-Risk Defense. The court finds that Respondent has not proved that any of these defenses apply.

### 1. **Well-Settled Defense**

The court first finds that the Well-Settled Defense may not be asserted here. This defense may be asserted only when an "action [is] not commenced within one year of the abduction." Miller, 240 F.3d at 402 n.14; accord Malmgren v. Malmgren, 747 F. App'x 945, 946 (4th Cir. 2019) ("Article 12 states "[t]he general rule that when a court receives a petition for return within one year after the child's wrongful removal, the court shall order the return of the child forthwith." (quoting Lozano v. Alvarez, 572 U.S. 1, 5 (2014))); Smedley v. Smedley, No. 7:14-CV-66-F, 2014 WL 11996390, at *11 (E.D.N.C. Apr. 28, 2014).

Z.R. was removed from Jamaica in August 2019. Petitioner filed her Verified Petition in this court on June 5, 2020.

(Verified Pet. (Doc. 1).) Petitioner thus filed her Verified Petition within one year of Z.R.'s removal, meaning the Well-Settled Defense is not available to Respondent.

Respondent's argument that, since Petitioner waited until three weeks before the one-year mark, the court should consider the defense, is unpersuasive. First, the court finds the removal occurred in August 2019, when Z.R. left with Respondent for a scheduled visit, not June 2019.[15] That visit was part of the informal custody agreement between Respondent and Petitioner. The wrongful removal of Z.R. occurred when Respondent took Z.R. back to the U.S. in August 2019 instead of leaving him in Jamaica with family. Second, Respondent provides no authority for this court to ignore the black-letter law cited above. Indeed, the Fourth Circuit recently held, in a persuasive unpublished opinion, that a "district court's finding that it could consider the 'well-settled' defense even if the petition was filed within the one-year timeframe is not supported by the Convention or case law analyzing the relevant articles." Malmgren, 747 F. App'x at 946.

---

[15] In his Verified Answer, Respondent conceded that Z.R. was only visiting him for the summer when he left in June 2019. (Verified Answer (Doc. 15) ¶ 9.)

-29-

Further, even if the court were to find that it could consider the Well-Settled Defense, the facts of this case do not support the defense. See infra, Section II.A. Respondent has failed to establish the Well-Settled Defense.

### 2. **Wishes of the Minor Child**

Respondent argues that Z.R. wishes to remain with him in the United States, and that Z.R. is of sufficient age and maturity to make that decision. After an in camera examination of Z.R., the court disagrees.

The court "may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, art. 13. A respondent has the burden of proving this by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B). "However, "[a] child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child." Pub. Notice 957, 51 Fed. Reg. 10,494, 10,510 (Mar. 26, 1986) (emphasis added). Because the Hague Convention does not set forth a particular age at which a child's opinion should be considered, the court must make a

-30-

fact-based inquiry. See de Silva v. Pitts, 481 F.3d 1279, 1287 (10th Cir. 2007).

After considering its in camera examination of Z.R., as well as other evidence deduced at trial, the court does not find that Z.R.'s preference to stay in the U.S. should prevent his return to Jamaica. The court reaches this conclusion for three reasons.

First, the court notes that, during its in camera examination, Z.R. did not object to his return to Jamaica. He indicated he would be comfortable with that outcome, though he would prefer to stay in the U.S. (Minute Entry 07/23/2020.) Still, Z.R. made it clear he loved both his parents and would not object to return. (Id.)

Second, though the court was immensely impressed by Z.R.'s intelligence, personality, poise, and conversational abilities during the in camera examination, it is not convinced that Z.R.'s priorities indicate the requisite level of maturity for the court to alter its legal conclusion based on Z.R.'s preference. Z.R. repeatedly emphasized that his preference for the U.S. over Jamaica was based on the fact that he was able to do more activities here than in Jamaica. Z.R. informed the court that he enjoyed going to movies, amusement parks, and taking other trips with his father, stepmother, and friends. Z.R. did

-31-

not indicate that he felt safer in the U.S. or that he was receiving a better education; instead, his focus was the amount of fun he could have in the U.S. as compared to Jamaica. Of course, the court does not fault Z.R. for preferring a place that is more "fun"; he is a vivacious thirteen-year-old. However, given that Petitioner has clearly established a prima facie case for his return, the court would be remiss to alter that clear legal conclusion based on Z.R.'s preference.

Third, to the extent Z.R. did express a preference to remain in the U.S., the court finds that his preference is partly a product of undue mental and emotional influence from Respondent.[16] Petitioner testified that Respondent has largely cut off communication between her and Z.R. (Minute Entry 08/05/2020.) Respondent admitted that communications were limited but claimed that was due to his work schedule and the fact that Z.R. no longer has his own phone. (Id.) The court finds Petitioner's testimony that Respondent largely cut off communications between her and Z.R. credible and finds Respondent's testimony that he has exerted no influence over Z.R. not credible.

---

[16] The court does not find there is any evidence of physical duress. Indeed, the court does not question Respondent's love and affection for his son.

In particular, the court credits Petitioner's testimony that her access to Z.R. has been significantly reduced while Z.R. has been with Respondent. (Id.) Petitioner provided details about average calls per day and average times. (Id.) Petitioner provided detailed testimony about how often she would speak with Z.R. before he was removed and even testified about how much better communications were when Respondent sent Z.R. to live with Respondent's family in Florida for a period around March 2020. (Id.) Petitioner also testified to times when she could hear Respondent in the background, indicating he was monitoring Z.R.'s conversation with Petitioner. (Id.) Petitioner testified about these matters clearly, without hesitation, and did not contradict herself. The court finds her testimony credible and assigns it great weight.

By contrast, Respondent's contradicted himself and was prone to mischaracterize events.[17] Respondent testified Petitioner's conversations were limited because of his own schedule and time zone differences. (Id.) Respondent's

---

[17] As an example, Respondent, when asked about the visa application letter he would not sign, started by saying that everything in the letter was false. However, when asked by the court about four specific sentences, he admitted all were true. The most charitable reading of Respondent's testimony is that it was prone to extreme hyperbole. However his testimony is labeled, the court finds much of Respondent's testimony unreliable.

pretextual explanation for why he was not able to let Z.R. speak to Petitioner more often is undercut by his other admissions. For instance, Respondent admitted he told Z.R. to not give Petitioner Respondent's home address, and Respondent also told Z.R. not to tell Petitioner where he went to school. (Id.) In fact, Respondent told Z.R. that if he provided that information, Petitioner would send immigration services to pick him up, take him back to Jamaica, and that Z.R. would not be able to see his father for a long time. (Id.) Z.R. confirmed this story during his in camera examination with the court. (Minute Entry 07/23/2020.) Z.R. also stated that Respondent shared Petitioner's Verified Petition and other suit papers with Z.R., further indicating Respondent attempted to influence Z.R. regarding the outcome of this case. (Id.; Minute Entry 08/05/2020.)

The most disturbing part of Respondent's testimony involves his explanation for why Z.R. did not have his own phone. Z.R. indicated to this court during his in camera examination that he broke his phone. (Minute Entry 07/23/2020.) During his deposition, Respondent responded to a question from Petitioner's counsel about whether he controlled Petitioner's access to Z.R.; he answered in part that "[w]henever [Z.R.] break his phone -- like I say, he always break his phone . . . ." (Doc. 22-1 at

-34-

21.) At trial, however, Respondent stated that he was the one who broke Z.R.'s phone — he broke it by throwing it against a post. (Minute Entry 08/05/2020.) Respondent tried to qualify his deposition testimony during trial by claiming he was just offering the additional fact that Z.R. breaks a lot of things he owns, not that Respondent was indicating Z.R. broke his phone. (Id.) Respondent never indicated in his deposition that he was the one who broke Z.R.'s phone. The court does not find Respondent's explanation of his deposition testimony persuasive and instead finds that Respondent broke Z.R.'s phone, misled counsel during his deposition about that fact, and influenced Z.R. to do the same during his in camera examination.

Finally, the court finds, as Z.R. indicated, that Respondent told Z.R. that if he is returned to Jamaica, Respondent would not see Z.R. again until he is 18. (Minute Entry 07/23/2020.) The court finds this to be a clear instance of Respondent's attempt to manipulate Z.R. and bring undue influence to bear on Z.R.'s choices.

In conclusion, the court finds that Respondent has failed to establish the Wishes-of-the-Minor-Child Defense. The court's own in camera examination of Z.R. revealed he does not object to his return to Jamaica, nor did he provide statements that convince this court it should deny Petitioner's request for

-35-

return. The court also finds Z.R. has been under the influence of Respondent in a way that makes Z.R.'s preference uncompelling as a defense to Petitioner's case for return.

### 3. **Grave-Risk Defense**

Finally, Respondent raises the Grave-Risk defense. The court finds that Respondent has failed to establish the defense by clear and convincing evidence.

Article 13(b) contains an exception to return when "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Smedley, 2014 WL 11996390, at *4 (quoting Asvesta v. Petroutsas, 580 F.3d 1000, 1004 (9th Cir. 2009)). "Significantly, as explained by the State Department, to invoke the defense, the party seeking to establish the exception must 'show that the risk to the child is grave, not merely serious.'" Gomez v. Fuenmayor, 812 F.3d 1005, 1012 (11th Cir. 2016) (quoting Hague International Child Abduction Convention; Text and Legal Analysis, 51 FR 10494-01, 10510 (1986)).

The defense must be proved by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). Allegations alone are not sufficient; there must be evidence supporting the conclusion that the child is at risk. Hirst v. Tiberghien, 947 F. Supp. 2d

-36-

578, 595 (D.S.C. 2013) (allegations of sexual abuse not supported by evidence).

> Furthermore, it is not this court's prerogative or its mandate in the instant litigation to determine whether one parent would be better than the other, or whether the environment offered by Respondent is superior to the environment offered by Petitioner. See Whallon v. Lynn, 230 F.3d 450, 459 (1st Cir. 2000) (courts considering Article 13(b) grave risk exception "are not to engage in a custody determination or to address such questions as who would be the better parent in the long run."); see also Hague International Child Abduction Convention; Text and Legal Analysis, 51 FR 10,510 ("'intolerable situation' was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State.").

Id. at 596. Finally, as the Fourth Circuit pointed out in Miller, courts in return countries are normally able to protect children, a fact that should often convince U.S. courts that the Grave-Risk Defense does not apply. See Miller, 240 F.3d at 402.

For the defense to apply, respondents must provide evidence of severe, concrete risk to the minor child. Courts in other circuits have described a spectrum of risk with this defense:

> "At one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do.

Baxter v. Baxter, 423 F.3d 363, 373 (3d Cir. 2005) (quoting
Blondin v. Dubois, 238 F.3d 153, 162 (2d Cir. 2001)). "This
defense requires the alleged physical or psychological harm to
be a great deal more than minimal. Only severe potential harm to
the child will support this defense." Marquez v. Castillo, 72
F. Supp. 3d 1280, 1287 (M.D. Fla. 2014) (quoting Whallon, 230
F.3d at 459; citing Nunez-Escudero v. Tice-Menley, 58 F.3d 374,
377 (8th Cir. 1995)). At "the time the Convention was adopted,
the State Department took care to emphasize that grave risk
doesn't 'encompass . . . a home where money is in short supply,
or where educational or other opportunities are more limited.'"
Cuellar v. Joyce, 596 F.3d 505, 509 (9th Cir. 2010) (quoting 51
Fed. Reg. 10494, 10510 (1986); citing Baxter, 423 F.3d at 365–
66, 373).

     Courts have refused to deny return on grave-risk grounds
even when the parent in the return country has received threats
from violent gangs, Salguero v. Argueta, 256 F. Supp. 3d 630,
639–40 (E.D.N.C. 2017) (MS13 threats against parent in return
country), when return is to a country that is generally
considered "dangerous," Alonzo v. Claudino, No. 106CV00800, 2007
WL 475340, at *5 (M.D.N.C. Feb. 9, 2007) (fact that return would
be to Honduras not reason enough), or if child is returning to a
home without indoor plumbing and questionable sanitation,

Cuellar, 596 F.3d at 509 ("Billions of people live in circumstances similar to those described . . . . If that amounted to a grave risk of harm, parents in more developed countries would have unchecked power to abduct children from countries with a lower standard of living.").

Courts do find the exception applies in situations where the evidence clearly establishes grave psychological and physical harm that the courts in the country of habitual residence cannot prevent. See Blondin, 238 F.3d at 162 (discussing situation where the risk was a case of was well-established PTSD from previous abuse of child, a harm that a court could not prevent since being returned would trigger it); see also Walsh v. Walsh, 221 F.3d 204, 219 (1st Cir. 2000) (finding grave risk of harm in returning child to father who physically abused mother in front of children, was "extremely violent," and repeatedly ignored court orders); Gomez, 812 F.3d at 1012 (discussing situation where children's return would place them in the middle of well-established drug violence involving child's primary custodian); Leonard v. Lentz, 748 F. App'x 87, 89 (8th Cir. 2019) (defense applied to child who had received a kidney transplant and was not cleared to travel).

As for evidence that Z.R. is at grave risk if returned, Respondent offers only the following.

First, Respondent points out that Z.R. was living with an eighteen-year-old and twenty-one-year-old after Petitioner took her job in the U.K. (Verified Answer (Doc. 15) ¶ 34; Minute Entry 08/05/2020.) Respondent argues that such a living situation is unsafe. Respondent does not provide, nor did he testify to, any examples of neglect or abuse by Z.R.'s cousins. Petitioner, on the other hand, testified that she trusted both her niece and nephew. (Id.) In fact, as the text messages admitted at trial demonstrate, Respondent first suggested Petitioner leave Z.R. with Petitioner's niece. (Id.) Petitioner also testified that she would check in on Z.R. every day, usually twice a day, and that Petitioner's sister would also visit to ensure all was well. (Id.)

Further, Respondent fails to acknowledge that Petitioner's original plan for Z.R. in August 2019 was for him to live with his aunt, Petitioner's sister, in Clarendon, not with Petitioner's niece and nephew. (Id.) Even if Z.R. was going back to live with his cousins, there is no evidence that Z.R. would

-40-

be subjected to an "intolerable situation" or "severe potential harm."[18]

It seems as if Respondent is actually arguing not that Z.R. is in imminent danger if he returns, but that he disagrees with Petitioner's parenting decisions, and that he can provide a more stable environment for Z.R. However, it is not the role of this court to resolve that dispute or judge Petitioner's care plan for Z.R. See Whallon, 230 F.3d at 459.

Respondent's second point is that Clarendon, Jamaica, is an unsafe place. Respondent's only evidence on this point is his own testimony that Clarendon has the third highest murder rate in Jamaica. (Minute Entry 08/05/2020.) Respondent is not a criminologist or statistician, nor did Respondent put that fact into context. Even if he had put forth other evidence in support of this statistic, since courts have found the Grave-Risk Defense does not apply to places with well-documented violence, this court finds Respondent's testimony does not establish the defense by clear and convincing evidence.

─────────────

[18] The court also notes that Petitioner testified that if this court granted her request for return, she would take a leave of absence to return to Jamaica and pursue a custody action. Even if Petitioner could not return, however, the court would still find the Grave-Risk Defense has not been established.

-41-

Finally, Respondent argues that the risk from COVID-19 is so great that he should not be required to return Z.R. to Jamaica. (Verified Answer (Doc. 15) ¶ 35.) The court does not find this testimony persuasive. Respondent testified that he recently brought his six-year-old daughter from Jamaica to stay with him in the U.S.; he will be taking her back later this month. (Minute Entry 08/05/2020.) COVID-19 does not satisfy the Grave-Risk Defense.

### III. <u>CONCLUSION</u>

For the foregoing reasons, the court finds that Petitioner has established by a preponderance of the evidence that Z.R. should be returned to Jamaica. Respondent has not established that any of the affirmative defenses apply.

**IT IS THEREFORE ORDERED** that Petitioner's Verified Petition under the Hague Convention on the Civil Aspect of International Child Abduction, (Doc. 1), is **GRANTED.**

**IT IS FURTHER ORDERED** that the minor child, Z.R., shall be returned forthwith to the Country of Jamaica. Respondent shall arrange for Z.R. to be returned to Jamaica on or before September 4, 2020.

**IT IS FURTHER ORDERED** that all travel documents are to be returned to the parties and Z.R. to permit compliance with his Order.

-42-

**IT IS FURTHER ORDERED** that Respondent's Motion to Dismiss, (Doc. 23), is **DENIED AS MOOT.**

A judgment in accordance with this Memorandum Opinion and Order will be entered contemporaneously herewith.

This the 26th day of August, 2020.

_____
United States District Judge

Case 1:20-cv-00498-WO-JLW   Document 25   Filed 08/26/20   Page 43 of 43